No. 13-5103
NOT YET SCHEDULED FOR ORAL ARGUMENT
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

THE ARK INITIATIVE, *et al.*,

*Plaintiffs-Appellants*,

v.

THOMAS TIDWELL,

*Defendant-Appellee*,

and

ASPEN SKIING COMPANY,

*Intervenor-Appellee*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

**OPENING BRIEF FOR APPELLANTS**
_____

William S. Eubanks II
Eric R. Glitzenstein
MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206
beubanks@meyerglitz.com

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

**A.    Parties:**  The parties who appeared in the district court, and are also parties in this Court, are:

1. Plaintiff-Appellants: The Ark Initiative and Donald Duerr.

2. Defendant-Appellee: Thomas Tidwell, Chief, United States Forest Service.

3. Intervenor-Appellee: Aspen Skiing Company.

4. There were no *amici* in the district court and are none in this Court.

**B.    Rulings Under Review:**  The rulings under review are (1) the Memorandum Opinion and Order entered by the United States District Court for the District of Columbia on February 14, 2013, denying Plaintiffs' motion for reconsideration, and (2) the Memorandum Opinion and order entered by the United States District Court for the District of Columbia on October 5, 2012 entering summary judgment for all Defendants in case no. 12-1467.  The October 5, 2012 Memorandum Opinion is reported as *Ark Initiative v. Tidwell,* 895 F. Supp. 2d 230 (D.D.C. 2012).

**C.    Related Cases:**  Counsel are unaware of any related cases pending in this Court or any other court.

## Rule 26.1 Jurisdictional Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellants'

The Ark Initiative – a 501(c)(3) non-profit organization – and Donald Duerr, an

individual, state that they have no parent corporations or any publicly held

corporations that own 10% or more of its stock.

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTES AND REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.     Statutory Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          1.     The Wilderness Act and the Roadless Regulations . . . . . . . . 4

          2.     National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . 9

          3.     Administrative Procedure Act . . . . . . . . . . . . . . . . . . . . . . . . 11

      B.     Facts Underlying Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . 12

          1.     The Service's 2002 Roadless Inventory and
                Subsequent Decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          2.     Legal Challenge to the Service's 2006 Decision . . . . . . . . . . 14

          3.     The Colorado Roadless Rule . . . . . . . . . . . . . . . . . . . . . . . . . 14

          4.     Plaintiffs' Roadless Petition . . . . . . . . . . . . . . . . . . . . . . . . . 16

iii

C.     Proceedings in the District Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

D.     The District Court's Decision and Plaintiffs' Motion
       for Reconsideration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

II.    THE CRR IS NOT AMBIGUOUS, AND THUS THE DISTRICT
       COURT ERRED IN DEFERRING TO THE SERVICE'S
       CONSTRUCTION OF THE RULE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III.   EVEN IF THE CRR WERE AMBIGUOUS, THE DISTRICT COURT
       ERRED BY AFFORDING *AUER* DEFERENCE TO THE
       SERVICE'S PROFFERED INTERPRETATION. . . . . . . . . . . . . . . . . . 36

       A.     *Auer* Deference Is Not Warranted Because the Service's
              Interpretation of the CRR Is Not A Permissible Construction of
              the Regulation's Plain Terms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

       B.     Even if the Service's Interpretation Is a Permissible Reading of
              the CRR, Auer Deference Is Unwarranted because Its Application
              Would Violate Federal Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

              1.     Plaintiffs Timely Raised the NEPA Issue in the District
                     Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

              2.     Auer Deference Cannot Be Afforded to an Application of
                     the CRR that Violates NEPA. . . . . . . . . . . . . . . . . . . . . . . 49

IV.    THE SERVICE'S OTHER RESPONSE IS ALSO UNPERSUASIVE,
       AND ONLY REINFORCES THAT THE AGENCY NEVER TOOK A
       HARD LOOK AT PLAINTIFFS' PETITION AND EVIDENCE. . . . . . . 57

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

CERTIFICATE OF COMPLIANCE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

ADDENDUM

# TABLE OF AUTHORITIES[1]

**PAGE**

## CASES

Ark Initiative v. U.S. Forest Serv.,
  No. 06-2418, 2010 WL 3323661 (D. Colo. Aug. 18, 2010)..................................14

*Auer v. Robbins,
  519 U.S. 452 (1997) ........................................................................ 2, 36, 39, 40

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,
  462 U.S. 87 (1983) ...................................................................................9

Bowen v. Georgetown Univ. Hosp.,
  488 U.S. 204 (1988) ...............................................................................40

* Bowles v. Seminole Rock & Sand Co.,
  325 U.S. 410 (1945) ........................................................................ 36, 47

* Christensen v. Harris Cnty.,
  529 U.S. 576 (2000) ........................................................................ 29, 35

* Christopher v. SmithKline Beecham Corp.,
  132 S. Ct. 2156 (2012) ................................................................ 38, 39, 46

City of Idaho Falls v. FERC,
  629 F.3d 222 (D.C. Cir. 2011) ...............................................................47

Connecticut Power & Light Co. v. NRC,
  673 F.2d 525 (D.C. Cir. 1982) ...............................................................46

Decker v. Nw. Envtl. Def. Ctr.,
  133 S. Ct. 1326 (2013) ................................................................... 37, 38

Dyson v. Dist. of Columbia,
  710 F.3d 415 (D.C. Cir. 2013) ...............................................................27

---

[1]  Authorities upon which Plaintiffs chiefly rely are marked with asterisks.

Exportal Ltda v. United States,
    902 F.2d 45 (D.C. Cir. 1990) .................................................................34

Friends of Blackwater v. Salazar,
    691 F.3d 428 (D.C. Cir. 2012) ..............................................................49

Gardebring v. Jenkins,
    485 U.S. 415 (1988) ................................................................................44

Gerber v. Norton,
    294 F.3d 173 (D.C. Cir. 2002) ..............................................................45

Kaiser Found. Hosps. v. Sebelius,
    708 F.3d 226 (D.C. Cir. 2013) ..............................................................44

Khan v. Parsons Global Servs., Ltd.,
    428 F.3d 1079 (D.C. Cir. 2005) ............................................................27

L. R. Willson & Sons, Inc. v. Donovan,
    685 F.2d 664 (D.C. Cir. 1982) ..............................................................31

* Lands Council v. Martin,
    529 F.3d 1219 (9th Cir. 2008) ................................... 10, 11, 52, 53, 55, 56

League of Wilderness Defenders/Blue Mountains Biodiversity Proj. v. Forsgren,
    309 F.3d 1181 (9th Cir. 2002) ...............................................................47

* Massachusetts v. EPA,
    549 U.S. 497 (2007) ......................................................................... 11, 26

* Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) ..................................................................................26

* National Audubon Soc'y v. U.S. Forest Serv.,
    46 F.3d 1437 (9th Cir. 1993) ....................................................... 52, 55, 57

Natural Res. Def. Council v. EPA,
    25 F.3d 1063 (D.C. Cir. 1994) ..............................................................47

Robertson v. Methow Valley Citizens Council,
  490 U.S. 332 (1990) ...................................................................................50

* Smith v. U.S. Forest Serv.,,
  33 F.3d 1072 (9th Cir. 1994)...................................... 11, 52, 53, 55, 57

Southwest Center for Biological Diversity v. Babbitt,
  215 F.3d 58 (D.C. Cir. 2000) .................................................................49

* Stinson v. United States,
  508 U.S. 36 (1993) .......................................................... 25, 36, 46, 54

Talk Am., Inc. v. Mich. Bell Tel. Co.,
  131 S. Ct. 2254 (2011) ........................................................... 37, 38

Thomas Jefferson Univ. v. Shalala,
  512 U.S. 504 (1994) .................................................................................46

**STATUTES**

* 5 U.S.C. § 555(e) ................................................................................. 11, 58

* 5 U.S.C. § 706(2)(A)............................................................................ 26, 55

* 16 U.S.C. §§ 1131-1136 ........................................................................ 2, 4, 9

28 U.S.C. § 1291 .............................................................................................1

28 U.S.C. § 1331 .............................................................................................1

* 42 U.S.C. §§ 4321-4370f ...........................................................................2,9

**REGULATIONS**

36 C.F.R. § 219.7(c)(2)(v) .............................................................................6

36 C.F.R. § 220.5(a)(2) ........................................................................... 10, 50

36 C.F.R. § 294.11 .................................................................................6

36 C.F.R. § 294.40 .................................................................................7

* 36 C.F.R. § 294.41 ................................................................. 15, 16, 53

36 C.F.R. § 294.45(a) ...........................................................................50

* 36 C.F.R. § 294.47 ............................ 17, 20, 24, 28, 30, 31, 35, 39, 41, 42, 43, 53

* 36 C.F.R. § 294.49 ................................................................... 7, 8, 12

36 C.F.R. §§ 293.2(b)-(c) .......................................................................6

40 C.F.R. § 1500.1 ...............................................................................54

40 C.F.R. § 1501.4 ...............................................................................9

43 C.F.R. § 19.2 ...................................................................................6

## **Glossary**

APA          Administrative Procedure Act

AR           Administrative Record

ASC          Aspen Skiing Company

CRA          Colorado Roadless Area

CRR          Colorado Roadless Rule

DE           Docket Entry

EA           Environmental Assessment

EIS          Environmental Impact Statement

IBMRA        Inventoried Burnt Mountain Roadless Area

JA           Joint Appendix

NEPA         National Environmental Policy Act

TAI          The Ark Initiative

USFS         United States Forest Service

WRNF         White River National Forest

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action against the U.S. Forest Service ("Service" or "USFS") pursuant to 28 U.S.C. § 1331. The district court granted summary judgment for Defendants, and denied summary judgment for Plaintiffs, on October 5, 2012, and denied Plaintiffs' motion for reconsideration on February 14, 2013. Plaintiffs filed a timely notice of appeal on April 8, 2013, and accordingly this Court has jurisdiction pursuant to 28 U.S.C. § 1291.[1]

## STATEMENT OF ISSUES

1.      Whether the district court erred by construing the Colorado Roadless Rule ("CRR") to prohibit roadless designation of all parcels of public lands that fall within ski area permit boundaries, including parcels that satisfy the agency's own objective roadless criteria and therefore are not degraded by their proximity to a ski area, when the CRR itself does not imply any such limitation, and when that construction conflicts with the agency's statements during the rulemaking process indicating that designated roadless areas and ski areas may, in fact, overlap under the rule's application.

---

[1]  Plaintiffs are a non-profit organization – The Ark Initiative – and an individual named Donald Duerr. Mr. Duerr submitted a standing declaration in the district court, *see* Docket Entry ("D.E.") 12-8, Joint Appendix ("J.A.") at ___, and the district court found that Plaintiffs have standing to pursue their claims. *See* D.E. 28 at 13-15 (J.A  ).

2.    Whether, under the framework articulated in *Auer v. Robbins*, 519 U.S. 452 (1997), deference to an agency's *post hoc* interpretation of its own ambiguous regulation is appropriate when the agency's interpretation – first proffered during litigation – is inconsistent with the regulation's plain language, preamble, and accompanying environmental review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f.

3.    Whether, under *Auer*, deference to an agency's interpretation of its regulation, once found to be a permissible construction of the regulation's plain terms, is appropriate when that interpretation conflicts with federal law.

## STATUTES AND REGULATIONS

Pertinent provisions of the Wilderness Act, 16 U.S.C. §§ 1131-1136, NEPA, 42 U.S.C. §§ 4321-4370f, and the CRR, 36 C.F.R. §§ 294.40-294.49, are set forth in the Addendum to this brief.

## STATEMENT OF THE CASE

This suit concerns the cursory denial of a citizen petition by the Service in which Plaintiffs sought the agency's review to determine whether the natural and undeveloped condition of a particular parcel of public lands in the White River National Forest ("WRNF") in Colorado warrants "roadless" designation, and, in

turn, the protections conferred by that designation, including certain limitations on

tree cutting and other environmentally destructive activities.  B00026-55 (J.A.  ).[2]

In denying the petition, the Service sent two responses – neither of which

purported to undertake any review of the parcel's characteristics relative to

roadless designation.  The first response pointed to previous litigation in Colorado

that did not involve at all the question of the parcel's eligibility for roadless

designation.  B00056 (J.A.  ).  The second response – sent after this lawsuit was

filed – relied on the Service's recently promulgated CRR as the basis for denying

the petition, and also purported to rely on "site-specific knowledge" of agency

personnel without pointing to any particular knowledge or documents the Service

relied on in denying the petition.  B00057 (J.A.  ).

The district court deemed the CRR ambiguous as to whether it covers

parcels not specifically identified in the rule, preamble, or accompanying NEPA

review.  D.E. 28 at 19-20 (J.A  ).  While finding Plaintiffs' and the Service's

conflicting regulatory interpretations to both constitute permissible readings of the

CRR, *id.*, the district court nevertheless afforded *Auer* deference – a legal doctrine

never raised by any party during merits briefing – to the agency's litigating

---

[2]  The administrative record citations appear as "B___" for records related to
Plaintiffs petition and its denial, and as "S___" for records related to a previous
lawsuit involving these parties.

position that the disputed parcel cannot, as a matter of law, be designated as "roadless" because it is within an existing ski area boundary.

As discussed below, the district court's decision is not sustainable under Supreme Court and Circuit precedent for several reasons. First, the CRR and accompanying decision documents do not support the Service's litigation position that the regulation categorically bars roadless designation in this parcel. Second, *Auer* deference is not warranted here because the plain terms of the CRR simply do not apply to the parcel in question, and as a result the agency's reading of the rule is facially impermissible. Finally, in any event, *Auer* deference is not warranted in this instance because its application would result in a patent violation of federal law. For these reasons, the district court's ruling should be reversed.

## STATEMENT OF FACTS

### A.     Statutory Framework

#### 1.     The Wilderness Act and the Roadless Regulations

In the Wilderness Act, 16 U.S.C. §§ 1131-1136, Congress created the National Wilderness Preservation System on public lands "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." *Id.* § 1131(a). Congress directed that wilderness areas "shall be administered for the use and enjoyment of the American people in such

4

manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas [and] the preservation of their wilderness character." *Id.* Congress further directed that "each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character." *Id.* § 1133(b).

Congress defined "wilderness" as an area "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain," and set forth an objective set of criteria by which federal agencies must assess eligibility of public lands for potential long-term wilderness preservation. *Id.* § 1131(c). Among other protections afforded designated wilderness is a prohibition against roads: "there shall be . . . no permanent road within any wilderness area designated by this chapter and . . . there shall be no temporary road." *Id.* § 1133(c).

In its implementing regulations, the Service recognizes that "[w]ilderness will be made available for human use to the optimum extent consistent with the maintenance of primitive conditions," and that "[i]n resolving conflicts in resource use, wilderness values will be dominant to the extent not limited by the Wilderness

5

Act, subsequent establishing legislation, or the regulations in this part."  36 C.F.R.

§§ 293.2(b)-(c).  Because the nonexistence of roads is a key feature of wilderness

under the Act and Service regulations, *see id*. § 293.6 ("there shall be in National

Forest Wilderness . . . no temporary or permanent roads"), the Service regularly

conducts an "inventory" to determine what USFS lands contain "roadless"

characteristics.  The purpose of the inventory is to ensure that roadless areas can be

preserved by the Service as potential wilderness until such time as the Service can

prepare a wilderness study and ultimately recommend some or all of those roadless

lands for wilderness designation to Congress.  *See* 43 C.F.R. § 19.2 (explaining

that a "[r]oadless area means a reasonably compact area of undeveloped Federal

land which possesses the general characteristics of a wilderness and within which

there is no improved road that is suitable for public travel by . . . vehicles intended

primarily for highway use"); *see also* 36 C.F.R. § 219.7(c)(2)(v).  These

"inventoried roadless areas" are "identified in a set of inventoried roadless area

maps," although the Service may "subsequent[ly] update or revis[e] . . . those maps

through the land management planning process."  36 C.F.R. § 294.11.

On July 3, 2012, the Service promulgated the CRR, which governs the

designation and maintenance of roadless areas in Colorado, which are referred to

as Colorado Roadless Areas ("CRAs").  As the CRR explains, "[t]he intent of this

6

regulation is to protect roadless values by restricting tree cutting, sale, and removal; road construction and reconstruction; and linear construction zones within" CRAs.  *Id.* § 294.40; *see also id.* § 294.42 (generally prohibiting tree cutting in roadless areas).  The regulations provide a list of "[r]esources or features that are often present in and characterize Colorado Roadless Areas," including:

>    (1) High quality or undisturbed soil, water, and air;
>    (2) Sources of public drinking water;
>    (3) Diversity of plant and animal communities;
>    (4) Habitat for threatened, endangered, proposed, candidate, and
>        sensitive species, and for those species dependent on large,
>        undisturbed areas of land;
>    (5) Primitive, semi-primitive non-motorized and semi-primitive
>        motorized classes of dispersed recreation;
>    (6) Reference landscapes;
>    (7) Natural-appearing landscapes with high scenic quality;
>    (8) Traditional cultural properties and sacred sites; and
>    (9) Other locally identified unique characteristics.

*Id.* § 294.41.

   After the Service, as part of an inventory, has determined that a parcel of USFS land satisfies these criteria, the agency adds it to the list of CRAs found at 36 C.F.R. § 294.49, where it remains until such time as the Service conducts a wilderness study and makes a recommendation to Congress concerning wilderness designation, pursuant to the protections outlined in the regulations (*e.g.*, no tree cutting unless a narrow exception applies).  In the event that a modification of a CRA boundary is needed due to "changed circumstances" or new information, the

7

Service "may modify the boundaries of any designated [CRA] identified in §
294.49 or add new [CRAs]." *Id.* § 294.47(a).  Any "[m]odifications and additions
will be reflected in the set of maps maintained at the national headquarters office
of the . . . Service." *Id.*

Additionally, where there has been a factual error necessitating a boundary
revision, the Service "may issue administrative corrections after public
notice and a 30–day comment period." *Id.* § 294.47(b).  Administrative
corrections "are adjustments to remedy errors such as clerical [errors] or
improvements in mapping technology . . . [or] based on improved field data due to
updated imagery, global positioning system data, or other collected field data." *Id.*

The manner in which the Service authorizes a private party to undertake any
otherwise prohibited activity on USFS lands (such as tree cutting) is to issue a
"special use authorization" for a specific activity on a specific tract of public land.
*See id.* § 251.50(a).  The Service ordinarily gives this authorization in the form of a
special use "permit."  *See id.* § 251.51 (defining "special use permit").  When
appropriate, "[a]n authorized [USFS] officer may revoke or suspend a special use
authorization . . . [a]t the discretion of the authorized officer for specific and
compelling reasons in the public interest." *Id.* § 251.60(a)(2)(i).

8

### 2.    National Environmental Policy Act

NEPA requires that federal agencies prepare an Environmental Impact Statement ("EIS") for all major federal actions that "may" have significant environmental impacts.  42 U.S.C. § 4332(C).  The EIS must contain a detailed analysis of the environmental impacts of both the proposed action and reasonable alternatives to that action.  *Id.*  As the Supreme Court has explained, the "twin aims" of this requirement are to: (a) "place[] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," and (b) "inform the public that [the agency] has indeed considered environmental concerns in its decisionmaking process."  *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983) (quotation marks and citation omitted).

The Council on Environmental Quality's ("CEQ") regulations implementing NEPA require that, unless an activity is "categorically excluded" from NEPA compliance, an agency must either prepare an EIS, or, at the very least, an Environmental Assessment ("EA"), which is used to determine whether an EIS is necessary.  40 C.F.R. § 1501.4.  If an EA is prepared, it must discuss the need for, and environmental impacts associated with, both the proposed action and reasonable alternatives to the proposal.  *Id.* § 1508.9.  The EA must also "provide

9

sufficient evidence and analysis for determining whether to prepare" an EIS. *Id.*; *id.* § 1508.27(b) (listing the factors that determine if an EIS is necessary). If the agency concludes that an EIS is unnecessary, it must complete a Finding of No Significant Impact ("FONSI"), which must specifically justify why the activity will "not have a significant effect on the human environment." *Id.* § 1508.13.

With respect to NEPA's application to inventoried roadless areas, the Service's regulations require an EIS for "[p]roposals that would substantially alter the undeveloped character of an inventoried roadless area or a potential wilderness area." 36 C.F.R. § 220.5(a)(2). Specific to CRAs, USFS regulations require that "[p]roposed actions that would significantly alter the undeveloped character of a [CRA] require an [EIS]." *Id.* § 294.45(a). Courts have held that the Service must analyze under NEPA areas that are in fact roadless – regardless of their administrative label – as if they are inventoried roadless areas for purposes of disclosing the effects to these unique areas. *See, e.g.*, *Lands Council v. Martin*, 529 F.3d 1219, 1230-32 (9th Cir. 2008). Otherwise, the failure to disclose such effects before construction or tree cutting commences could permanently disqualify such areas from future wilderness designation and would undermine the explicit purposes of the Wilderness Act as well as NEPA. Similarly, in disclosing the effects to these roadless areas – whether or not they have been formally

10

inventoried as "roadless" by the Service – the Wilderness Act and NEPA require consideration of roadless areas in combination with other adjoining roadless and wilderness areas creating a single contiguous tract of lands that are, in fact, roadless. *Id.* The failure to do so, before authorizing irreversible activities to proceed, constitutes a violation of NEPA. *Id.*; *Smith v. USFS*, 33 F.3d 1072, 1078-79 (9th Cir. 1994).

### 3.     Administrative Procedure Act

Where an entity or individual petitions a federal agency, pursuant to statute or regulation, to compel the agency to consider an issue within its jurisdiction, the agency is required to provide, at minimum, "[p]rompt notice" of any "denial in whole or in part." 5 U.S.C. § 555(e). "Except in affirming a prior denial or when the denial is self-explanatory, *the notice shall be accompanied by a brief statement of the grounds for denial*." *Id.* (emphasis added). Not only must the agency provide a response, but it must provide a legally adequate response that actually responds in kind to the request from the petitioner, and that facilitates judicial review under the APA. *See Massachusetts v. EPA*, 549 U.S. 497, 527-28 (2007).

11

B.      **Facts Underlying Plaintiffs' Claims**

1.      **The Service's 2002 Roadless Inventory and Subsequent Decisions**

In 2002, the Service completed a Forest Plan revision process for the WRNF.  The Service determined that a parcel on Burnt Mountain satisfied the agency's roadless criteria and thus added the 1,712-acre Inventoried Burnt Mountain Roadless Area ("IBMRA") to the agency's roadless inventory, thereby protecting it from certain types of development, including tree cutting and ski run construction.  *See* 36 C.F.R. § 294.49 (identifying the IBMRA as CRA #289).

In contrast, however, without any explanation in the Forest Plan or accompanying decision documents, the Service entirely omitted from roadless inventory consideration another parcel on Burnt Mountain (the "disputed parcel"), although that parcel is adjacent to the IBMRA and appears to be "roadless" as that term is defined by USFS regulation.  As Plaintiffs described in their July 2012 petition at issue here, the disputed parcel on Burnt Mountain consists of 600-1,000 acres – approximately one square mile – and is adjacent to the 1,712-acre IBMRA and the 181,000-acre Maroon Bells–Snowmass Wilderness Area.  B00026-55 (J.A. ).  As the petition explained, the parcel is unique in that it is part of the last remaining intact, north-facing undeveloped slope in the valley surrounding Aspen,

12

and also because it provides habitat suitable for various species, including elk and the federally protected Canada lynx.  *See* B00031 & n.1.

In 2006, the Service issued a decision authorizing, via a special use permit, Defendant-Intervenor Aspen Skiing Company ("ASC") to undertake many activities within and outside of the disputed parcel, including cutting hundreds of trees to create three new ski runs and other ski area improvements at the Snowmass Ski Area within the disputed parcel.  The Service did not disclose in the 2006 decision the roadless characteristics of the disputed parcel, nor did it disclose how the cutting of ski runs could significantly and adversely impact the roadless characteristics and undeveloped nature of this unique area.  Nor, for that matter, did the decision explain how those impacts might permanently change the quality of this area and disqualify the parcel from potential wilderness designation.

Upon an administrative challenge, the Service's Appeals Deciding Officer reversed the Service's decision and accompanying NEPA review authorizing construction of an egress trail through a portion of the IBMRA – i.e., a *different* Burnt Mountain parcel – but upheld the decision authorizing the ski runs in the disputed parcel.

13

### 2.    Legal Challenge to the Service's 2006 Decision

In 2006, Plaintiffs The Ark Initiative ("TAI") and Donald Duerr brought suit in the U.S. District Court for the District of Colorado challenging certain broad aspects of the Service's 2006 decision.  In particular, the plaintiffs alleged that the agency had violated NEPA by failing to analyze the cumulative effects of a new $400 million Base Village being constructed to accommodate skiers at the Snowmass Ski Area.  The court ultimately ruled for the Service, *see Ark Initiative v. U.S. Forest Serv.*, No. 06-2418, 2010 WL 3323661 (D. Colo. Aug. 18, 2010), *aff'd*, 660 F.3d 1256 (10th Cir. 2011).  However, the court's ruling did not address at all the roadless and wilderness issues raised in this case.  Indeed, the information on which Plaintiffs have relied in support of the petition at issue here was not even in the administrative record in that case, and was not obtained by Plaintiffs until after that case was resolved.

### 3.    The Colorado Roadless Rule

On July 3, 2012, the Service issued the CRR.  77 Fed. Reg. 39576, B01020 (J.A.  ).  Among other things, the rule removed 8,260 *specifically identified* acres that were within "permitted ski area boundaries" from the roadless inventory. B01022 (J.A.  ).  While the CRR referred to the fact that the $2.6 billion Colorado ski industry would benefit from the rule, the agency recognized that it must set

14

forth a different justification for removing those 8,260 acres from the roadless inventory than merely providing benefits to ski companies – which is *not* a factor for determining whether an area must be afforded roadless protections. *See* 36 C.F.R. § 294.41. Thus, the Service purported to justify the loss of the 8,260 enumerated acres from the agency's roadless inventory by making specific factual determinations that each of the parcels being removed from the roadless inventory consisted of "roadless acres with degraded roadless area characteristics due to the proximity to a major recreational development," i.e., an operational ski development. B01022 (J.A.   ).

Crucially, however, the CRR did not specifically mention or implicate the disputed parcel. Nor, because the rule did not mention this parcel at all, did the CRR make any specific determination as to whether the disputed parcel consisted of "degraded roadless area characteristics due to the proximity to a major recreational development," i.e., the Snowmass Ski Area. Nor, for that matter, did the Service's EIS accompanying the CRR address in any manner the environmental implications of developing this specific parcel to facilitate commercial skiing.[3]

---

[3] To the extent that the CRR addressed Burnt Mountain at all, the Service only considered the effects of removing 80 acres of the IBMRA – i.e., an entirely *different* parcel than the disputed parcel – from the roadless inventory to facilitate

15

### 4.     Plaintiffs' Roadless Petition

On July 16, 2012, Plaintiffs submitted a formal petition to the Service, pursuant to USFS regulations and the APA, presenting extensive new information and evidence never previously considered by the agency, demonstrating that the disputed Burnt Mountain parcel fully satisfies the agency's own roadless criteria found at 36 C.F.R. § 294.41.  *See* B00026-55 (J.A.  ).  The petition included, among other information, recent satellite imagery, maps, and a signed declaration from Plaintiff Donald Duerr explaining that based on his personal observations while hiking this parcel, in addition to his analysis of satellite imagery and other recent information, the parcel is in fact "roadless" as that term is defined by USFS regulations.  B00038-48 (J.A. ).  The declaration attested to the parcel's unique attributes, and explained that there are no permanent roads and that the only structures that appear within this parcel are an historic cabin and a gate installed to regulate access to skiers.  *See* B00042-47.

On that basis, the petition requested that the agency invoke its authority to assess the parcel and make a factual determination concerning the roadlessness of this tract in light of the new information presented, considering that the best

---

an egress trail that the Service authorized in 2006.  *See, e.g.*, B00324-41 (comparing the pre-CRR roadless inventory with the post-CRR roadless inventory).

available evidence indicates that the Service's omission of the parcel from roadless designation was an "administrative error," *see* 36 C.F.R. § 294.47(b), or at least warranted a fresh consideration based on "changed circumstances." *See id.* § 294.47(a).

On August 17, 2012, WRNF Supervisor Scott Fitzwilliams sent a half-page response to the petition, indicating that the Service had considered Plaintiffs' request, but the agency simply pointed to the prior litigation in Colorado and stated that, as a result of that litigation, tree cutting "can be implemented" in the disputed parcel. B00056 (J.A.  ).  The response also stated that the Service was "working with [ASC] on the implementation schedule" for tree cutting and related activities, *id.*, and the Service summarily asserted that it was "denying [the] request to suspend the special use authorization for the project." *Id.*

The Service's response did not, however, provide any substantive explanation for the denial, particularly any explanation for why a denial of Plaintiffs' request with respect to the new ski runs was appropriate in view of the voluminous information and evidence submitted for the first time in Plaintiffs' petition, which the Service simply asserted that it gave "further consideration" to before providing its response. *Id.*

17

C.      **Proceedings in the District Court**

On August 31, 2012, Plaintiffs learned that ASC was proceeding with tree cutting on the disputed Burnt Mountain parcel, and they filed this lawsuit shortly thereafter.  *See* D.E. 1 (J.A.   ).

Several days after the Complaint was filed, but before Plaintiffs moved for a preliminary injunction, the Service sent Plaintiffs a second response to their petition on September 7, 2012, this time from the agency's chief – Defendant Thomas Tidwell.  *See* B00057 (J.A.   ).  Chief Tidwell's post-litigation denial relied primarily on the agency's 2012 CRR, although that rule did not specifically mention or address the disputed parcel at all.  Chief Tidwell's letter did not respond to the substance of Plaintiffs' petition, which focused on the disputed parcel and the reasons why *that parcel* qualifies as "roadless" and therefore warrants a boundary change.  Rather, Chief Tidwell's denial asserted that boundary modifications in the CRR involving the IBMRA – i.e., a *different* parcel – "were based on site-specific knowledge of [WRNF] personnel," *id.*, without ever specifying what "site-specific knowledge" he was referring to, when or how it had been obtained, or how it related to the specific information proffered by Plaintiffs demonstrating that the disputed parcel *did* in fact qualify for roadless (and wilderness) designation.

18

Upon the district court's request, the parties – including Defendant-Intervenor ASC – agreed to consolidate preliminary injunction briefing with merits briefing, pursuant to Fed. R. Civ. Pro. 65(a)(2).  Plaintiffs argued that the Service's responses were arbitrary and capricious because neither the Colorado litigation cited by the Service's first response nor the CRR cited by the agency's second response addressed the roadlessness of the disputed parcel.  *See* D.E. 12-1 at 18-21 (J.A.  ); D.E. 21 at 6-10 (J.A.  ).  In particular, Plaintiffs argued that the agency's post-litigation application of the CRR as applying to this particular parcel – despite the fact that the rule only made specific factual findings as to *other* parcels – violated NEPA because the agency never analyzed the environmental impacts of altering the roadless characteristics of the disputed parcel.  *See* D.E. 21 at 4 (J.A  ).

While asserting that the Service's reliance on the CRR was not arbitrary because it categorically applies to any parcel within a ski permit boundary – whether or not specifically identified by the rule – the Service and ASC primarily raised jurisdictional arguments concerning standing and res judicata.  Neither the government nor ASC argued that the Service's interpretation of the CRR was entitled to *Auer* deference, or even cited that case.  Nor did any party raise the doctrine of *Auer* deference during oral argument on October 4, 2012.  *See* D.E. 30 (J.A.  ).

19

**D.    The District Court's Decision and Plaintiffs' Motion for Reconsideration**

The day following oral argument, the court issued a ruling finding that Plaintiffs had established standing, and that, because their claims involved denials of a 2012 petition based on evidence never previously considered by the agency, the claims were not barred by res judicata or statute of limitations as Defendants had contended. *See* D.E. 28 at 13-16 (J.A.  ).  On the merits, the court held that the CRR was ambiguous and that there are two permissible readings of the regulation: (1) Plaintiffs' interpretation whereby the CRR only removed from the roadless inventory specifically enumerated parcels, consisting of 8,260 acres, which had been analyzed under NEPA and which the Service found to consist of degraded roadless qualities, and (2) the Service's interpretation that the court found was suggested by Chief Tidwell's post-litigation response – the *first time the agency ever purported to interpret the CRR* – whereby the CRR "precludes *future designation* of [any] roadless areas within ski permits," and thus renders 36 C.F.R. § 294.47 categorically inapplicable to any and all parcels of lands within ski permit boundaries regardless of whether the agency actually evaluated such parcels in its rule or accompanying NEPA review.  *See id.* at 19-20 (J.A.  ) (emphasis added).

Applying *Auer* deference *sua sponte* to the latter interpretation, *id.* at 19 (J.A.  ), the court stated that "it was not arbitrary and capricious for the Chief to

20

read the Colorado Roadless Rule as laying out a forward-looking 'rule' prohibiting roadless designations in ski areas, and therefore disqualifying the Burnt Mountain parcel from roadless designation." *Id.* at 20 (J.A.   ).  Accordingly, the court entered judgment for Defendants, finding that "any error in earlier inventories is harmless because the Burnt Mountain parcel cannot qualify as roadless now anyway." *Id.* at 19-20 (J.A.   ).

Plaintiffs timely moved for reconsideration, pointing out that no party had invoked *Auer* deference and emphasizing that the district court's expedited merits ruling only addressed the first prong of the *Auer* deference framework – i.e., whether the Service's interpretation of the CRR was a permissible construction of the rule's plain terms.  While Plaintiffs respectfully disagreed that the agency's post-litigation application of the rule could be sustained under the first prong of *Auer*, Plaintiffs' reconsideration motion explained that, in any event, the district court never analyzed whether the Service's interpretation could be sustained under the second prong of *Auer*, i.e., a court may not defer to an agency interpretation of an ambiguous regulation if its application would violate federal law.  *See* D.E. 29 at 6-14 (J.A.   ).  Here, because the Service's interpretation would allow a parcel that, in fact, has no roads and otherwise satisfies the agency's roadless criteria to be degraded by tree cutting and other activities that cannot otherwise ordinarily

21

occur in a roadless area – without the loss of roadless qualities and the foreclosure of potential wilderness designation ever being subject to any NEPA review – Plaintiffs argued that the Service's application of the CRR is a patent violation of federal law, i.e., NEPA, and hence could not be the beneficiary of *Auer* deference even had the agency invoked that doctrine.  *See* D.E. 29 at 6-14 (J.A.   ); D.E. 33 at 5-9 (J.A.   ).

Before ruling on the motion, the district court requested briefing on whether Plaintiffs' claims were moot in light of certain limited tree cutting that had already occurred.  Upon receipt of those briefs, the court ruled that the case was not moot because additional activities authorized by the Service and that ASC made clear it might undertake in the future would impair Plaintiffs' interests in the disputed parcel.  *See* D.E. 37 at 2 (J.A.   ).

In a single paragraph, however, the court rejected Plaintiffs' reconsideration request without addressing whether *Auer* deference could lawfully apply in these circumstances for the reasons raised by Plaintiffs.  Although Plaintiffs had in fact made clear in their merits briefing that the disputed parcel's purported inclusion in the CRR had never been subjected to NEPA review, *see* D.E. 21 at 4 (J.A   ), the district court rejected the reconsideration request on the sole grounds that in merits

22

briefing "Plaintiffs never suggested that the Rule, as interpreted, would violate NEPA." *Id.* at 3 (J.A.  ).

## SUMMARY OF ARGUMENT

1.      The district court's ruling that the denial of Plaintiffs' petition was validly based on the Service's invocation of the 2012 CRR is in error.  The CRR allowed many otherwise prohibited activities (e.g., mineral mining, ski area expansion) on specified tracts of formerly inventoried roadless lands expressly identified in the rule.  However, in the agency's final rule, preamble, and accompanying EIS, the Service *never* mentioned – much less analyzed – the disputed Burnt Mountain parcel.  Rather, the CRR sought to remove from the roadless inventory 8,260 enumerated acres – for which the agency had assertedly made specific factual determinations that they consisted of degraded roadless area characteristics – located in specific parcels of public lands at thirteen different Colorado ski areas.  The parcel at issue in the petition was not among those 8,260 enumerated acres.

Hence, because the rule itself did not apply, and cannot reasonably be read to apply, to the disputed parcel, nor did the rule make any specific determination as to the roadless character of *this* parcel vis-à-vis its proximity to the Snowmass Ski Area, the CRR is unambiguous and has no bearing on the disputed parcel's status

23

relative to the roadless inventory. As a result, the district court erred by construing the CRR as applying to this parcel by finding that "any error" with respect to this parcel "in earlier inventories is harmless because [it] cannot qualify as roadless now anyway," on the basis that the CRR "precludes future designation of [any] roadless areas within ski permits" and therefore "it does not matter whether the Burnt Mountain parcel has the characteristics of a roadless area." D.E. 28 at 19-20 (J.A.  ). To the contrary, however, because the rule did not apply to parcels (such as the one at issue) never identified in the rule, analyzed under NEPA, or found to consist of degraded roadless characteristics, and because the Service explicitly contemplated that ski areas and roadless areas may in fact overlap, Plaintiffs are entitled under 36 C.F.R. §§ 294.47(a)-(b) to a legally adequate response to their petition and the specific information in it demonstrating that the parcel *does* in fact qualify as roadless under USFS regulations.

2.     Even if the district court correctly found that the CRR is subject to more than one reasonable reading, the Service's post-litigation interpretation of the rule upheld by the district court is *not* a permissible reading of the CRR, and therefore cannot be sustained under the first prong of *Auer*. An agency's interpretation may only be afforded *Auer* deference if it is consistent with the plain terms of the rule itself. For the reasons explained above, the construction of the

24

CRR proffered by Chief Tidwell's response and upheld by the district court – that the regulation applies to all parcels within ski area boundaries and permanently forecloses their ability to be designated as roadless – is not supported by the rule, preamble, or accompanying EIS.  Accordingly, because the Service's interpretation is facially inconsistent with the rule the agency seeks to apply, even if the CRR were deemed ambiguous, the district court erred in affording *Auer* deference to the agency's litigating position.

**3.**     Further, even if the Service's interpretation of the CRR were consistent with the regulation itself – which it is not – that interpretation nevertheless fails under the second prong of *Auer*, which the district court never analyzed, because its application would result in a flagrant violation of federal law, i.e., NEPA.  *Auer* deference is only permissible where an agency's regulatory interpretation comports with federal law.  *See, e.g.*, *Stinson v. United States*, 508 U.S. 36, 45 (1993) (explaining that *Auer* deference is impermissible where the agency's interpretation will "violate the Constitution or a federal statute").

Here, because the agency's interpretation of the CRR would mean that environmentally destructive activities can proceed in the disputed parcel – or any similarly situated parcels not specifically identified in the CRR – without the Service ever undertaking NEPA review of the impact of such activities on this

25

parcel's loss of roadless characteristics (or the loss of its potential future designation as wilderness), the Service's construction is flatly inconsistent with NEPA, and thus defeats any claim of *Auer* deference.  Moreover, contrary to the district court's sole rationale for denying Plaintiffs' reconsideration motion, although no party had suggested that *Auer* deference was appropriate here, Plaintiffs' merits briefing made clear that any application of the CRR to the disputed parcel could not be reconciled with NEPA.  *See* D.E. 21 at 4 (J.A.   ).

## **ARGUMENT**

### I.    **STANDARD OF REVIEW**

Where an agency fails to provide a reasoned explanation for its denial of a petition, the agency's failure is arbitrary, capricious, and an abuse of discretion under 5 U.S.C. § 706(2)(A).  *See Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983); *see also Massachusetts*, 549 U.S. at 527 (recognizing that "the affected party ha[s] an undoubted procedural right to file [petitions] in the first instance," and when its petition is denied, to challenge the basis for the denial as arbitrary and capricious).  Similarly, in responding to a petition, an agency's action is arbitrary and capricious if it fails to consider relevant factors under the pertinent statutory or regulatory scheme.  *State Farm*, 463 U.S. at 42-43.

This Court's "review of the grant of summary judgment is *de novo*." *Khan v. Parsons Global Servs., Ltd.*, 428 F.3d 1079, 1082 (D.C. Cir. 2005).[4]

The Court "normally review[s] district court denials of Rule 59(e) motions only for abuse of discretion." *Dyson v. Dist. of Columbia*, 710 F.3d 415, 420 (D.C. Cir. 2013). But, as this Court has recently explained, "[t]here are some situations, however, in which we review the [d]istrict [c]ourt's denial of a motion for reconsideration *de novo*," particularly where, as here, this Court reviews an issue that was raised in merits briefing but not addressed by the district court, rather than a new issue raised in the first instance in a reconsideration request. *Id.*

## II.   THE CRR IS NOT AMBIGUOUS, AND THUS THE DISTRICT COURT ERRED IN DEFERRING TO THE SERVICE'S CONSTRUCTION OF THE RULE.

This case can be resolved without resorting to the *Auer* framework at all, because – as Plaintiffs maintained throughout the district court litigation – the CRR is not ambiguous. The CRR's plain terms, its preamble, and its accompanying NEPA review make clear that the rule does not apply to the disputed parcel which

---

[4] Plaintiff Duerr submitted a standing declaration in the district court explaining how tree cutting and other activities by ASC will harm his cognizable interests in the disputed parcel. *See* D.E. 12-8 (J.A.   ). The district court found that Plaintiffs have standing to pursue their claims, not only because of the environmental harms that will necessarily affect Plaintiffs, but also because of the procedural injuries resulting from the Service's refusal to adequately consider and respond to Plaintiffs' petition. *See* D.E. 28 at 13-15 (J.A.   ).

27

was never specifically identified therein. Hence, the Service's purported denial of Plaintiffs' petition by simply pointing to the existence of the 2012 CRR does not constitute the legally adequate response to which Plaintiffs are entitled under the APA, because the Service may in fact undertake the review of the disputed parcel's roadless characteristics requested by Plaintiffs' petition pursuant to 36 C.F.R. §§ 294.47(a)-(b).

Accordingly, the district court erred by adopting an interpretation of the rule – as proffered by the Service – that was contrary to the rule's plain terms, because it is simply not the case that "any error" with respect to the disputed parcel "in earlier inventories is harmless because [it] cannot qualify as roadless now anyway." D.E. 28 at 19-20 (J.A.  ).  Rather, that conclusion reflects the district court's mistaken understanding that the rule categorically "precludes *future* designation of [any] roadless areas within ski permits," *id.* (emphasis added), including areas never specifically mentioned anywhere in the CRR or accompanying EIS.

In defining the limits on *Auer* deference, the Supreme Court has held that deference to an agency rule is unwarranted where the regulation itself is unambiguous, particularly where the agency's interpretation would give the force of law to actions not explicitly addressed by the regulation.  In rejecting a request

for *Auer* deference in the context of a Labor Department rule, the Court explained

that:

> [I]n this case the Department of Labor's regulation does not address
> the issue of compelled compensatory time. . . . Nothing in the
> regulation even arguably requires that an employer's compelled use
> policy *must* be included in an agreement.  The text of the regulation
> itself indicates that its command is permissive, not mandatory.
> Seeking to overcome the regulation's obvious meaning, the United
> States asserts that the agency's opinion letter interpreting the
> regulation should be given deference under our decision in *Auer*.  In
> *Auer*, we held that an agency's interpretation of its own regulation is
> entitled to deference.  But *Auer* deference is warranted only when the
> language of the regulation is ambiguous.  The regulation in this case,
> however, is not ambiguous – it is plainly permissive.  To defer to the
> agency's position would be to permit the agency, under the guise of
> interpreting a regulation, to create *de facto* a new regulation.  Because
> the regulation is not ambiguous on the issue of compelled
> compensatory time, *Auer* deference is unwarranted.

*Christensen v. Harris Cnty.*, 529 U.S. 576, 587-88 (2000) (internal citations

omitted).  That is precisely the case presented here, where the rule in question

clearly does not address the parcel for which Plaintiffs seek agency review, and the

agency's litigating position applying the rule would have the effect of retroactively

extending the regulation to parcels (including the disputed parcel) never mentioned

in the rule, i.e., the creation "*de facto* [of] a new regulation."  *Id.* at 588.

Accordingly, because the rule is unambiguous, as described below, this Court need

not reach the *Auer* framework to resolve Plaintiffs' claim.

29

As a threshold matter, the Service cannot point to any place in the CRR rulemaking process where this parcel – or any other unidentified parcel – was contemplated, addressed, or analyzed.  On the other hand, however, there are several distinct places in the rule and accompanying decision documents where the Service makes clear that: (1) the CRR applies *only* to the specifically enumerated parcels that were removed from the roadless inventory based on specific factual determinations as to their roadless qualities, and (2) in any event, the CRR was never intended to permanently foreclose roadless designation of any parcels within ski areas boundaries (including the disputed parcel).[5]

First, the rule's plain terms do not support the Service's interpretation, but rather support Plaintiffs' construction of the rule.  Crucially, the CRR provisions

_____

[5]  To be clear, in the CRR the Service made a threshold determination that certain enumerated parcels totaling 8,260 acres are in fact degraded and thus are no longer roadless in the agency's estimation, then made a formal decision – after review and public comment – to remove these specifically enumerated acres from the roadless inventory.  The agency did *not* make a similar determination or disclosure for any other acres within ski area boundaries, including the disputed parcel.  However, Plaintiffs do not imply that in removing the specifically enumerated 8,260 acres from the roadless inventory the Service intended to permanently preclude those 8,260 acres (or any other parcels) from being considered for roadless designation under 36 C.F.R. §§ 294.47 in the future.  There is nothing in the rule or administrative record to suggest that the Service intended such a sweeping preclusive effect.  To the contrary, as discussed below, the Service's own pronouncements in the EIS make clear the agency did contemplate that CRAs and ski areas could overlap under the rule's application.

invoked by Plaintiffs' petition – 36 C.F.R. §§ 294.47(a)-(b) – which allow for roadless area boundary changes due to "changed circumstances" or "administrative corrections," do not have any express limitations as written. Thus, under basic canons of construction, regardless of what the Service now professes it intended, these CRR provisions are only limited to the extent that the rule expressly placed conditions on their application, and in 36 C.F.R. §§ 294.47(a)-(b), the Service certainly did *not* limit their application in any way, including with respect to parcels, such as the disputed parcel, that fall within ski area boundaries. *See L. R. Willson & Sons, Inc. v. Donovan*, 685 F.2d 664, 675 (D.C. Cir. 1982) ("It is well settled that regulations cannot be construed to mean what an agency intended but did not adequately express.") (quotation marks and citation omitted).[6]

Second, the CRR's preamble expressly states that the purpose of the rule, with respect to ski areas, is to "exclude[] *approximately 8,300 acres* of permitted ski area boundaries or ski area management allocations from" the roadless inventory. B01022 (J.A.  ) (emphasis added). Those "approximately 8,300 acres" to be removed from the roadless inventory were specific parcels identified to the

---

[6]  Indeed, even a parcel that *was* removed from the roadless inventory by the CRR because of its degraded qualities may be considered for "changed circumstances" or "administrative corrections" under 36 C.F.R. §§ 294.47(a)-(b) – which, again, has no express limitations – in the event that, for example, an inaccurate boundary was drawn in the CRA maps adopted simultaneous with the CRR, or in the future is found to no longer exhibit degraded roadless characteristics.

public throughout the rulemaking process, as confirmed by the EIS accompanying the rule, which specifically analyzed only 8,260 acres of specific parcels for removal from the roadless inventory.  *See* B00870 (J.A.  ).  Therefore, the CRR's preamble and accompanying EIS underscore that the Service contemplated removing 8,260 specifically identified acres for which specific factual determinations had been made purportedly justifying their removal – not some larger but undefined acreage of National Forest lands (including the disputed parcel) never addressed at all by the CRR.

Third, and perhaps most importantly, the Service justified the removal of the specifically identified 8,260 acres only after an extensive environmental review of *those* parcels, and after making specific determinations – based on the accompanying environmental review – that these particular parcels consist of "degraded roadless area characteristics due to the proximity to a major recreational development."  B01022 (J.A.  ).  In stark contrast, nowhere in the rule, preamble, or EIS did the Service ever purport to make any specific determination as to whether the disputed parcel consists of "degraded roadless area characteristics due

32

to the proximity to a major recreational development," i.e., the Snowmass Ski

Area.[7]

This is important for two reasons: (1) as explained in Plaintiffs' petition, the

available evidence suggests that it would be difficult for the Service to conclude

that *this* parcel is in fact "degraded" by its proximity to the Snowmass Ski Area

because the natural physiogeography of the area creates a physical buffer so that

visual and auditory degradation from the ski area are not discernible from this

parcel, *see* B00026-55 (J.A.  ); and (2) in any case, the justification set forth by the

rule that it only removes "approximately 8,300 acres" from the roadless inventory

cannot be reconciled with the agency's present position (and the district court's

ruling) that the CRR retroactively applies to the nearly 1,000-acre disputed parcel –

and potentially many more thousands of acres of public lands *never* identified to

---

[7]  The fact that the Service asserted that it specifically determined that each of the
parcels being removed from the roadless inventory via the CRR consisted of
"degraded roadless area characteristics" demonstrates the flaw in the Service's
litigation position and the district court's ruling that "it does not matter whether the
Burnt Mountain parcel has the characteristics of a roadless area" because the CRR
"precludes future designation of [any] roadless areas within ski permits."  D.E. 28
at 19-20 (J.A.  ).  If it did not matter whether parcels within ski areas have roadless
characteristics, there would have been no need for the Service to find in the CRR
that the 8,260 specifically enumerated parcels were, in fact, degraded.

the public in the rulemaking process – involving a greater environmental impact

than suggested by the CRR (or presented to the public).[8]

Finally, in addition to demonstrating why the parcel at issue was never

addressed by the CRR, the EIS further confirms that roadless areas and ski areas

*can*, in fact, overlap under the CRR – contrary to the district court's erroneous

finding that this is "a forward-looking 'rule' prohibiting [all] roadless designations

in ski areas."  D.E. 28 at 20 (J.A.  ).  Indeed, the EIS analyzing the rule's effects

made clear that under the preferred alternative – Alternative 2 – inventoried

roadless areas *can* in fact fall within ski area boundaries: "It would be permissible

to cut trees incidental to implementing a permitted, ski-area management activity,

---

[8]  Public accountability during rulemaking is an important objective that would be
completely eviscerated if agencies could – as the Service has here – adopt
unforeseen interpretations of a rule after promulgation.  *See, e.g.*, *Exportal Ltda v.
U.S.*, 902 F.2d 45, 50 (D.C. Cir. 1990) ("Courts' reliance on the 'plain meaning'
rule in this setting is not a product of some fetishistic attraction to legal
'formalism.'  In order to infuse a measure of public accountability into
administrative practices, the APA mandates that agencies provide interested parties
notice and an opportunity for comment before promulgating rules of general
applicability.  This right to participate in the rulemaking process can be
meaningfully exercised, however, only if the public can understand proposed rules
as meaning what they *appear* to say.  Moreover, if permitted to adopt unforeseen
interpretations, agencies could *constructively amend* their regulations while
evading their duty to engage in notice and comment procedures.  As applied to
agency regulations, then, the plain meaning doctrine is an interpretive norm
essential to perfecting the scheme of administrative governance established by the
APA.") (citations omitted).

not otherwise prohibited in a CRA. *Such ski area expansions without road construction could take place in upper tier acres, as well as in regular CRA acres.*" B00869-70 (J.A.  ) (emphasis added). Therefore, because the agency's own EIS contradicts the district court's ruling and explains that roadless areas and ski areas can in fact overlap under the CRR, this only further reinforces that the process for petitioning for designation of roadless areas is *not* categorically inapplicable to lands within ski area permit boundaries.

In sum, because the CRR, preamble, and EIS clearly reflect that the CRR does not apply to *this* parcel and that agency review of the parcel pursuant to 36 C.F.R. § 294.47 remains viable, the district court's finding of ambiguity and its adoption of an interpretation inconsistent with the clear intent and plain language of the CRR cannot be sustained. *See Christensen*, 529 U.S. at 587-88.[9]

---

[9] To the extent that Defendants may argue that Chief Tidwell's response indicated that the Service undertook a site-specific analysis of this parcel's roadlessness, *see* B00057 (stating that during the CRR decisionmaking process, "changes to the area were made based on site-specific knowledge of White River National Forest personnel"), that argument is not supported by the record. Contrary to Chief Tidwell's letter, there is *nothing* in the administrative record demonstrating any boundary modifications made to *this* Burnt Mountain parcel – as opposed to other parcels on Burnt Mountain such as the IBMRA – as part of the CRR, or any documents reflecting the "site-specific knowledge" of Service personnel or any site-specific analysis of the roadless characteristics of the disputed parcel as part of the 2012 CRR rulemaking process.

### III. EVEN IF THE CRR WERE AMBIGUOUS, THE DISTRICT COURT ERRED BY AFFORDING *AUER* DEFERENCE TO THE SERVICE'S PROFFERED INTERPRETATION.

While the Court need not reach the *Auer* framework because the CRR is not ambiguous, should the Court find the rule ambiguous and subject to more than one meaning – as the district court did – the Service's interpretation offered for the first time in response to this litigation cannot be sustained because it is facially inconsistent with the rule's plain terms and because its application would result in a flagrant violation of federal law.

The *Auer* framework is premised on the notion that an agency's interpretation of its own ambiguous regulation is "controlling unless 'plainly erroneous or inconsistent with the regulation.'"  *Auer*, 519 U.S. at 461 (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)).  The Supreme Court has developed a two-part test for determining whether an agency's interpretation of an ambiguous regulation should be afforded deference: (1) whether the agency's proffered interpretation is a permissible construction of the rule's plain language, and (2) whether the agency's interpretation would violate federal law.  *See, e.g.*, *Stinson*, 508 U.S. at 45.

36

For the following reasons, the Service's interpretation offered for the first time during this litigation cannot be sustained under *either* prong of the *Auer* framework, and must be rejected.

A.    ***Auer* Deference Is Not Warranted Because the Service's Interpretation of the CRR Is Not A Permissible Construction of the Regulation's Plain Terms.**

Particularly where, as here, an agency seeks to "interpret" a purportedly vague rule in response to litigation in a manner that retroactively expands the rule's scope adverse to an affected party's interest, a request for *Auer* deference raises serious separation of powers and fairness concerns.  *See, e.g.*, *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1339-42 (2013) (Scalia, J., concurring in part and dissenting in part) ("Congress cannot enlarge its *own* power through *Chevron* – whatever it leaves vague in the statute will be worked out *by someone else*. *Chevron* represents a presumption about who, as between the Executive and the Judiciary, that someone else will be. . . . But when an agency interprets its *own* rules – that is something else.  Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a 'flexibility' that will enable 'clarification' with retroactive effect. . . . *Auer* is not a logical corollary to *Chevron* but a dangerous permission slip for the arrogation of power"); *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2266

37

(2011) (Scalia, J., concurring) (noting that it is "contrary to fundamental principles of separation of powers to permit the person who promulgates a law to interpret it as well").[10]

Moreover, improperly affording *Auer* deference to post-rule agency interpretations, particularly interpretations that first arise in a litigation context, severely prejudices the public's administrative rights to notice and comment procedures designed to inform and involve the public in the rulemaking process. *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012) ("[D]eferring to an agency's interpretation of its own ambiguous regulations . . . creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby frustrating the notice and predictability purposes of rulemaking") (quotation marks and citation omitted); *accord Talk Am.*, 131 S. Ct. at 2268 (Scalia, J., concurring) (explaining that excessive *Auer* deference "frustrates the notice and predictability purposes of rulemaking, and promotes arbitrary government").

The Supreme Court has thus explained that *Auer* deference is "unwarranted when there is reason to suspect that the agency's interpretation 'does not reflect the

---

[10] *See also Decker*, 133 S. Ct. at 1338 (Roberts, C.J., concurring) (explaining that there are "serious questions about the principle set forth in" *Auer* and that "[i]t may be appropriate to reconsider that principle in an appropriate case").

agency's fair and considered judgment on the matter in question'" because "it appears that the interpretation is nothing more than a 'convenient litigating position' . . . or a '*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." *Christopher*, 132 S. Ct. at 2166 (quoting *Auer*, 519 U.S. at 462) (citations omitted).

    Here, the Service's proffered interpretation – which is nothing more than its convenient litigating position first set forth in a letter that post-dated Plaintiffs' Complaint, *see* B00057 (J.A.  ) – is that *all* lands, including the disputed parcel, that fall within ski permit boundaries are *per se* subject to the CRR and thus are precluded from roadless designation pursuant to 36 C.F.R. § 294.47.  While the district court found that both Plaintiffs and the Service set forth plausible interpretations of what that court deemed an ambiguous rule, the court – invoking *Auer* – deferred to the agency's interpretation by finding that "[o]ne permissible reading of the [CRR] – maybe even the best reading – is that the Rule precludes future designation of [any] roadless areas within ski permits."  D.E. 28 at 19-20 (J.A.  ).[11]

_____

[11]  Although the only questions before the Court under the *Auer* framework are whether the *agency's* proffered interpretation is permissible and in accordance with federal law, Plaintiffs again note that their interpretation – i.e., the CRR only has force as to the 8,260 acres of specifically identified public lands, analyzed under NEPA, and explicitly removed by the rule from the roadless inventory because the

As a threshold matter, however, Plaintiffs note that it is not at all clear that the post-litigation letter upon which the Service now relies, and upon which the district court ruling hinges, sets forth the broadly preclusive CRR interpretation sustained by the district court. That letter simply asserted that the CRR "excluded" from the roadless inventory some lands "within ski area permit boundaries," and asserted that "[t]his change was applied to the" IBMRA – i.e., a different parcel than the disputed parcel. B00057. Under *Auer*, a court may only defer to the agency's own *official* position on a regulation's meaning – espoused in a letter or otherwise – and Chief Tidwell's letter, which does *not* on its face set forth the broadly preclusive interpretation of the CRR sustained below, is the *only* purportedly official communication that alludes to the 2012 CRR. Accordingly, because it appears that the Service's "interpretation" of the CRR here is, at most, nothing more than what agency counsel creatively teased out of Chief Tidwell's letter in district court briefing, there is simply no formal agency interpretation to which this Court may afford deference, thereby foreclosing the application of *Auer* here. *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (explaining that deference is not appropriately accorded "to agency litigating

---

Service asserted they were found to have degraded roadless qualities – is the *only* interpretation that is consistent with the plain language of the final rule, preamble, and accompanying EIS. *See supra* at 27-35.

positions" and that courts must decline "agency counsel's interpretation[s] . . .
where the agency itself has articulated no position on the question").

In any event, even assuming Chief Tidwell *had* offered the CRR
interpretation the district court ascribed to his post-litigation letter, the district
court's ruling nevertheless failed to grapple with the fact that the agency's
litigation interpretation conflicts with the rule's plain terms, and in any event
retroactively eliminates the procedural comment rights of interested members of
the public, including Plaintiffs, and fails under *Auer* for those reasons.[12]

First, as noted, the plain language of the CRR simply does not support the
Service's post-litigation interpretation. There are no express limitations in the

---

[12] While expressly acknowledging that the rule only referred to and analyzed
8,260 specified acres that did not include this parcel, the district court suggested in
dicta that a "bizarre regime" could result from Plaintiffs' interpretation. *See* D.E.
at 19-20 (J.A.  ). However, in fact, there would be nothing bizarre at all for the
Service to consider a previously unanalyzed parcel for inclusion into the roadless
inventory on the basis of an administrative correction or changed circumstances, as
expressly contemplated by 36 C.F.R. § 294.47, which would be the case even for
those parcels expressly removed by the CRR from the roadless inventory. Indeed,
for example, it cannot be the case that, if the Service in the future identifies a
highly endangered species on this (or any other) parcel which is subject to the
protections of the Endangered Species Act, the Service is nevertheless bound by
the purported categorical preclusive effect of the CRR and has no discretion,
pursuant to 36 C.F.R. § 294.47, to reconsider the parcel for inclusion in the
roadless inventory solely because it falls within a ski area boundary. That is yet
another reason why Plaintiffs' interpretation is the *only* construction that is
consistent with the rule's plain language.

CRR that preclude Plaintiffs (or others) from petitioning the Service to review the

disputed parcel (or other parcels) under the CRR's "changed circumstances" and

"administrative correction" provisions found at 36 C.F.R. §§ 294.47(a)-(b).

Accordingly, the Service cannot draw any support from the rule's terms to justify

its application of the CRR to this parcel.

Moreover, when the CRR's terms are reviewed in context with the rule's

preamble and EIS – NEPA review that was a legal precondition to the Service's

promulgation of the CRR – it becomes even clearer that the Service simply did not

adopt a rule that categorically precludes *future* designation of any roadless areas

within ski area boundaries; rather, it said that it was *only* removing the specified

8,260 acres from the roadless inventory, which the agency asserted, in both the

preamble and EIS, had been found to have degraded roadless characteristics and

thus no longer warranted roadless protection. *See* B01022 (J.A.  ) (explaining that

the purpose of the rule with respect to ski areas was to "exclude[] *approximately*

*8,300 acres* of permitted ski area boundaries or ski area management allocations

from" the roadless inventory based on findings that they had "degraded roadless

area characteristics") (emphasis added); B00870 (J.A.  ) (listing the parcels

42

analyzed in the EIS and the specific 8,260 acres that the Service would exclude

from the roadless inventory as a result of the CRR).[13]

Indeed, the Service's own table in the EIS enumerates the specific parcels

that total 8,260 acres, and omits any reference to the disputed parcel:

**Table 3-52.** *Ski Area Acreage in the IRAs but Not Included in CRAs*

| National Forest Ski Area(s) [1] | CRA(s) | Ski Area Permitted Acres [2] | Additional Ski Area Allocation Acres [3] | Total Ski Area Acres Excluded from CRAs |
|---|---|---|---|---|
| **Arapaho-Roosevelt National Forests** | | | | |
| Loveland | Bard Creek, Mount Sniktau | 1,370 | 1,620 | 2,990 |
| Winter Park | Vasquez Adjacent Area | 30 | 0 | 30 |
| **Grand Mesa, Uncompahgre, and Gunnison National Forests** | | | | |
| Crested Butte | Gothic | 900 | 0 | 900 |
| Pike-San Isabel National Forests | | | | |
| Ski Cooper | Mad Creek DB & DB1 | 560 | 0 | 560 |
| **Routt National Forest** | | | | |
| Steamboat Springs | Long Park | 180 | 0 | 180 |
| **San Juan National Forest (Draft Revised forest plan)** | | | | |
| Durango Mountain Resort | San Miguel | 0 | 90[4] | 90 |
| **White River National Forest** | | | | |
| Arapahoe Basin | Porcupine Peak | 1,050 | 0 | 1,050 |
| Aspen Mt | McFarlane | 50 | 0 | 50 |
| Beaver Creek | Meadow Mountain A, B | 510 | 0 | 510 |
| Breckenridge | Tenmile | 150 | 0 | 150 |
| Buttermilk | Burnt Mountain | 50 | 0 | 50 |
| Copper Mountain | Ptarmigan Hill | 720 | 0 | 720 |
| Snowmass | Burnt Mountain | 80 | 0 | 80 |
| Vail | Game Creek | 900 | 0 | 900 |
| **TOTAL** | | **6,550** | **1,710** | **8,260** |

---

[13]  As noted, the Service's interpretation also fails because the EIS confirms that the Service *did* contemplate that designated roadless areas and ski areas can, in fact, overlap under the CRR.  *See* B00869-70 (J.A.  ).  Thus, contrary to the Service's interpretation that this is "a forward-looking 'rule' prohibiting [all] roadless designations in ski areas," D.E. 28 at 20 (J.A.  ), the EIS confirms that 36 C.F.R. § 294.47 is *not* categorically inapplicable to parcels within ski area permit boundaries (even those parcels specifically removed by the CRR).

43

B00870 (J.A.   ).  The same is true for the EIS's direct comparison from the prior roadless inventory to the new CRA inventory.  *See* B00324-41.  Accordingly, no reasonable member of the public could have expected the disputed parcel to be subject to the CRR.

For these reasons, *Auer* deference is unwarranted here because the agency's belated interpretation – which would retroactively apply the CRR to this and other parcels never specifically identified in the rule, analyzed or mentioned in the EIS, or determined to consist of degraded roadless characteristics – is flatly inconsistent with the CRR's plain terms.  *See, e.g.*, *Kaiser Found. Hosps. v. Sebelius*, 708 F.3d 226, 230-31 (D.C. Cir. 2013) (declining to afford *Auer* deference to agency interpretation because it was "inconsistent with" the plain language of the regulation); *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988) (explaining that *Auer* deference is unwarranted if an "alternative reading is compelled by the regulation's plain language").

 Second, the Service's interpret-as-we-go approach has had the practical effect of foreclosing interested members of the public, including Plaintiffs, from a meaningful comment opportunity because of the impossibility of divining – during the CRR rulemaking process – that the Service would subsequently interpret the rule to significantly (and retroactively) broaden the scope of the rule's application.

44

For example, because on its face the CRR only sought to exclude 8,260 specifically identified acres from the roadless inventory, Plaintiffs and others never had fair notice or a meaningful comment opportunity to participate in the CRR rulemaking process because the rule did not purport to facially apply to the disputed parcel, which "has long been the single most important parcel in the National Forest System in Colorado to TAI and [Mr. Duerr]."  D.E. 29 ¶ 2 (J.A.  ).

As explained in a declaration submitted by Plaintiff Duerr in the district court, not only did the Service's CRR fail to put the public – and Plaintiffs in particular despite their longstanding keen interest in this particular parcel – on notice that this and other unidentified parcels would be subject to the rule *sub silentio*, but had Mr. Duerr been given notice that the agency would subsequently apply the CRR to the disputed parcel he "would have submitted extensive comments on the rulemaking and NEPA process urging protection of the roadless lands on Burnt Mountain."  *Id.* ¶¶ 4-6 (J.A.  ).[14]

---

[14]  Indeed, despite the fact that the district court's ruling essentially allows the *agency* to sandbag the public by issuing a rule that refers to specific parcels and then argue that it actually covers much more, the district court, anomalously, penalized *Plaintiffs* for not divining that the agency would engage in this procedural sleight of hand.  *See* D.E. 28 at 20 (J.A.  ) ("Plaintiffs chose not to comment on the Rule and thus cannot challenge it now.  If Plaintiffs wanted roadless designations in ski areas, they should have participated in the rulemaking.").  But that sort of bureaucratic gamesmanship has been severely criticized by this Court, *see, e.g.*, *Gerber v. Norton*, 294 F.3d 173, 181 (D.C. Cir.

45

For these reasons, the Service's proffered interpretation cannot withstand scrutiny under the first prong of *Auer*, and must be rejected.

**B.    Even if the Service's Interpretation Is a Permissible Reading of the CRR, *Auer* Deference Is Unwarranted because Its Application Would Violate Federal Law.**

Under the *Auer* framework, if an agency interpretation survives the first prong – i.e., it is deemed a permissible reading consistent with the rule's plain terms – the court must next determine, under the second prong, whether the agency's interpretation comports with federal law.  It is well-established under Supreme Court precedent that courts may not defer to an agency's interpretation of an ambiguous regulation if the interpretation would "violate the Constitution *or a federal statute*."  *Stinson*, 508 U.S. at 45 (emphasis added); *Christopher*, 132 S. Ct.

---

2002) ("Our cases make clear that an agency may not turn the provision of notice into a bureaucratic game of hide and seek.") (quotation marks and citation omitted); *Conn. Power & Light Co. v. NRC*, 673 F.2d 525, 530 (D.C. Cir. 1982) ("To allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be a genuine interchange as mere bureaucratic sport."), and it is also why requests for *Auer* deference should be closely scrutinized.  *See, e.g.*, *Christopher*, 132 S. Ct. at 2168; *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 525 (1994) (Thomas, J., dissenting) ("It is perfectly understandable, of course, for an agency to issue vague regulations, because to do so maximizes agency power and allows the agency greater latitude to make law through adjudication rather than through the more cumbersome rulemaking process.  Nonetheless, agency rules should be clear and definite so that affected parties will have adequate notice concerning the agency's understanding of the law.").

46

at 2169 (declining to afford *Auer* deference because the agency's interpretation was "flatly inconsistent" with federal law); *Seminole Rock*, 325 U.S. at 414 (explaining that even if an agency interpretation is consistent with its regulation, "[t]he legality of the result reached by this process, of course, is quite a different matter").[15]

Here, the Service's interpretation – should the Court reach this question – cannot be sustained because it would result in a violation of NEPA.

**1.      Plaintiffs Timely Raised the NEPA Issue in the District Court.**

As a threshold matter, the basis upon which the district court declined to reconsider this issue – "Plaintiffs never suggested [in merits briefing] that the Rule, as interpreted, would violate NEPA. . . . [and thus] forfeited their first argument," D.E. 37 at 3 (J.A.   ) – is simply erroneous.  While *no* party cited to *Auer* in merits briefing and it was first raised *sua sponte* in the district court's merits ruling,

---

[15]  *See also City of Idaho Falls v. FERC*, 629 F.3d 222, 229 (D.C. Cir. 2011) (finding that agency interpretation "suffers from a . . . fatal defect" because "it conflicts with the Commission's responsibilities under" federal law); *League of Wilderness Defenders/Blue Mountains Biodiversity Proj. v. Forsgren*, 309 F.3d 1181, 1190 (9th Cir. 2002) (holding that "[a]n agency simply may not interpret a regulation in a way that contravenes a statute"); *Natural Res. Def. Council v. EPA*, 25 F.3d 1063, 1070 (D.C. Cir. 1994) (explaining that, "[o]f course, however reasonable the agency's interpretation of its regulations, we must not give those regulations effect if they conflict with the governing statute").

Plaintiffs in fact argued in merits briefing that the agency's post-litigation

application of the CRR to this particular parcel violated NEPA because the agency

"cannot point to any place in the [CRR] and accompanying [EIS] where *this* parcel

is addressed or the environmental impacts of removing *this* parcel from the

roadless inventory analyzed . . . because the four corners of those documents never

considered it," D.E. 21 at 4 (J.A   ) – i.e., the same argument Plaintiffs raised on

reconsideration in the *Auer* context.

        Then, at oral argument, Plaintiffs' counsel explained that the Service's

interpretation could not be sustained because the agency had never conducted

NEPA review of the disputed parcel.  *See, e.g.*, D.E. 30 at 16 (J.A   ) (explaining

that "not only did [the EIS] not mention [the disputed parcel], Your Honor, it

didn't analyze it at all"); *id.* at 18 (J.A   ) (noting a "key point" that the Service's

EIS only analyzed a *different* parcel on Burnt Mountain, and arguing that "the

agency has [not] engaged and they have to admit that they haven't [conducted] any

environmental analysis about this 1,000 acre parcel" during the CRR rulemaking

process); *id.* at 22 (J.A   ) (explaining that, even if the court upheld the Service's

interpretation, before it could allow activities degrading the parcel's roadless

characteristics, the Service will "at minimum have to do a [NEPA] assessment

because they have never done that with respect to this parcel" relative to the CRR).

48

Indeed, the Service conceded in its Opposition to Plaintiffs' Motion for Reconsideration that Plaintiffs did, in fact, properly raise this issue on the merits. *See* D.E. 32 at 4 (J.A.  ) ("Although now couched as an argument on deference to agency interpretation, the underlying issue – whether the Forest Service adequately considered the roadless character of the parcel . . . in the Service's NEPA analysis for the [CRR] – *is the same that Plaintiffs raised in their earlier briefs*.") (emphasis added).  Accordingly, as the Service admitted, Plaintiffs timely raised this issue, and the district court therefore erred in failing to address it in either the merits ruling or the reconsideration ruling.[16]

### 2.    *Auer* Deference Cannot Be Afforded to an Application of the CRR that Violates NEPA.

As construed by the district court, the agency's post-litigation interpretation of the CRR is that the Service permanently "disqualif[ied] the Burnt Mountain

---

[16]  On that basis, the Court could remand to the district court for its consideration of the issue in the first instance.  *See Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 61 (D.C. Cir. 2000) (explaining that where a district court has failed "to assess the evidence and resolve the parties' dispute," and instead "sidestep[ped] this responsibility," this Court may remand to the district court for consideration in the first instance).  Alternatively, because "[t]he agency record is before us now just as it would be before the district court on remand and the district court has no comparative advantage in reviewing agency action for arbitrariness and capriciousness," and because "the merits of the question are clear," i.e., that the Service's application of the CRR to the disputed parcel violates NEPA – this Court may resolve this matter since no purpose would be served by remand.  *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 n.4 (D.C. Cir. 2012).

49

parcel from roadless designation" although that parcel was never identified by the CRR or analyzed in the EIS that was made available for public review. *See* D.E. 28 at 19-20 (J.A.  ).  In other words, the district court's adoption of that interpretation means that the Service, when it issued the CRR, authorized various irreversible activities in the disputed parcel (and, potentially, others like it that were not specifically identified in the CRR or analyzed in the EIS) without ever analyzing the disputed parcel under NEPA in the course of the CRR's adoption – i.e., the Service never took the "hard look" required by Congress *before* such activities may take place. *See, e.g.*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1990) (explaining that "by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast").

To be sure, the CRR itself lauds the importance of NEPA compliance particularly where the loss of roadless characteristics is at stake, as is the case here, explaining that NEPA review will be prepared "for any proposed action within a [CRA]," and "[p]roposed actions that would significantly alter the undeveloped character of a [CRA] require an [EIS]."  36 C.F.R. § 294.45(a); *see also id.* § 220.5.  Moreover, the CRR further confirms that "[n]othing in this subpart waives

50

any applicable requirements regarding *site specific environmental analysis, public involvement . . . or compliance with applicable laws*," including NEPA.  *Id.* § 294.48(e) (emphasis added).

But, here, the Service's interpretation allows precisely the types of activities – tree cutting and other ground disturbing activities that collectively may permanently alter the roadless characteristics and undeveloped nature of the disputed parcel (and hence its potential designation as wilderness) – that the CRR says cannot occur without site-specific NEPA review *before* such activities are authorized.  Indeed, this means that National Forest lands that were not even mentioned, let alone analyzed, in the EIS preceding adoption of the CRR are now nonetheless *permanently* precluded from protection as roadless and potentially wilderness areas.  Under Supreme Court and Circuit precedent delimiting the scope of *Auer* deference, this is simply not a result this Court should countenance.

In fact, the precise types of critical environmental impacts that will occur as a result of the Service's interpretation of the CRR as encompassing this parcel – i.e., the diminution in the parcel's roadless qualities and the likely permanent loss of the parcel from future wilderness designation – are environmental effects that courts have invariably held must be considered pursuant to NEPA *before* actions can take place in areas that, as a factual matter, contain no roads, *regardless of how*

51

*the agency administratively labels the area.  See, e.g.*, *Lands Council*, 529 F.3d at 1230-32 (explaining that "roadless areas are significant [under NEPA] because of their potential for designation as wilderness areas under the Wilderness Act," and holding that "the possibility of future wilderness classification triggers, at the very least, an obligation on the part of the agency to disclose the fact that development will affect . . . an area of sufficient size as to make practicable its preservation and use in an unimpaired condition"); *Smith v. USFS*, 33 F.3d at 1078-79 (finding that where "the land has been released . . . for nonwilderness [or nonroadless] use does not excuse the agency from complying with its NEPA obligations when implementing a land-use program"); *Nat'l Audubon Soc'y v. U.S. Forest Serv.*, 46 F.3d 1437, 1448 (9th Cir. 1993) (holding that "the decision to harvest timber on a previously undeveloped tract of land is an irreversible and irretrievable decision which could have serious environmental consequences" and thus requires NEPA review) (quotation marks and citations omitted).

NEPA takes on even more significance here because the disputed parcel is directly adjacent to both the 181,000-acre Maroon Bells–Snowmass Wilderness Area and the 1,712-acre IBMRA.  Courts have held when an agency authorizes action in a visibly unroaded, but uninventoried parcel that is contiguous to an inventoried roadless area or designated wilderness area, that is yet another impact

52

the agency must analyze under NEPA since the action will likely preclude future inclusion of the parcel into the adjoining wilderness or roadless area. *See, e.g.*, *Lands Council*, 529 F.3d at 1230-32 (requiring NEPA review of action in uninventoried roadless area of less than 5,000 acres because it bordered an inventoried roadless area); *Smith*, 33 F.3d at 1077-79 (9th Cir. 1994) (requiring NEPA review of action that would affect a 2,000-acre parcel of *uninventoried roadless land* in conjunction with 4,000 acres of adjacent inventoried roadless land).

Moreover, especially because Plaintiffs' petition demonstrated that the parcel *is in fact roadless* (i.e., contains no roads) and consists of other undeveloped characteristics used by the Service in determining whether to add a parcel to the roadless inventory, *see* 36 C.F.R. § 294.41, and thus that an "administrative correction" pursuant to 36 C.F.R. § 294.47 is needed to address a clear inventory error – a factual claim which is not refuted by *any* document in the administrative record – the Service was required under federal law to conduct NEPA review to publicly disclose and analyze the inevitable impacts to this particular parcel's roadless qualities from subjecting it to the CRR. This consideration must, at minimum, include how subjecting *this particular parcel* to the CRR will likely undermine future consideration of the parcel (and other similarly situated parcels

53

not specifically identified in the CRR or EIS) for wilderness designation, *before* any irreversible actions take place.  *See* 40 C.F.R. § 1500.1 (explaining that "NEPA procedures must insure that environmental information is available to public officials and citizens *before decisions are made and before actions are taken*") (emphasis added).

Accordingly, particularly because there is nothing in the record that refutes the information proffered in Plaintiffs' 2012 petition demonstrating that the disputed parcel is in fact unroaded and consists of undeveloped characteristics, *see* B00026-55 (J.A.   ), and thus that the Service was required to conduct NEPA review *before* permanently precluding roadless status and foreclosing future wilderness designation in this parcel, the agency interpretation endorsed by the district court – under which that change in status was authorized without *any* site-specific NEPA review of these impacts – is simply not a permissible construction of the CRR for purposes of *Auer* deference.  Hence, as a matter of law, it cannot be sustained by this Court.  *See, e.g.*, *Stinson*, 508 U.S. at 45 (explaining that courts may not defer to an interpretation of a regulation that "violate[s] the Constitution *or a federal statute*") (emphasis added).  And, because the Service's post-litigation interpretation is not a permissible reading of the CRR since it constitutes a patent violation of federal law, i.e., NEPA, this necessarily means that the Service's

54

response to Plaintiffs' petition – which, as the district court found, depended on that interpretation – was arbitrary, capricious, and not in accordance with law, in contravention of the APA.  5 U.S.C. § 706(2)(A).[17]

Indeed, in promulgating the CRR, the Service itself clearly recognized that – notwithstanding any previous individualized NEPA review of ski expansion activities in the 8,260 specifically identified acres designated as "roadless" prior to the CRR's issuance – NEPA review *of the impacts to roadless qualities in those parcels* was still necessary to harmonize the CRR with NEPA, as demonstrated by the agency's preparation of an EIS addressing the 8,260 acres that the rule advised the public would be removed from the roadless inventory.  *See* AR B01022 (J.A. ); B00870 (J.A.  ).  And even the chief of the Forest Service appeared to recognize

---

[17]  Because it may well be that there are other parcels within ski area boundaries in Colorado that, as a factual matter, do not contain roads but nonetheless were not in the roadless inventory prior to the CRR, the environmental effects to those parcels have also escaped legally required NEPA review as a result of Chief Tidwell's cursory interpretation and the district court's ruling relying on it.  *See* D.E. 28 at 19-20 (J.A.  ) (finding that "it does not matter whether . . . [a] parcel has the characteristics of a roadless area" because if it is inside a ski area "the [CRR] precludes designating it as roadless," and stating that "any error in earlier inventories is harmless").  But, as all courts to review this issue have held, it is certainly *not* "harmless" to allow irreversible impacts to a parcel's roadless characteristics (even if not officially labeled "roadless") without first conducting NEPA review, and thus the ruling must be reversed for that reason alone.  *See, e.g.*, *Lands Council*, 529 F.3d at 1230-32; *Smith*, 33 F.3d at 1077-79; *Nat'l Audubon Soc'y*, 46 F.3d at 1448.

that *some* degree of site-specific analysis would be necessary before a particular

parcel could have its status fundamentally altered in this manner – which,

presumably, is why he stated (albeit with no support anywhere in the record) that

the exclusion of the parcel at issue was somehow made based on "site-specific

knowledge of [WRNF] personnel."  B00057 (J.A   ).

    In any event, even assuming that the CRR is ambiguous, and assuming the

Service's interpretation is deemed to be a reasonable construction of the rule's

plain terms, the agency's interpretation is nevertheless impermissible and fatally

flawed because it contravenes a federal statute, i.e., NEPA.  Hence, *Auer* deference

is unwarranted as a matter of law.[18]

---

[18]  That the Service prepared an EA in 2006 concerning tree cutting on the Burnt
Mountain parcel is no help to the Service in saving its impermissible interpretation
from invalidity.  By definition, in 2006 the Service could not have considered the
new evidence submitted by Plaintiffs in 2012 or analyzed the effects of
*permanently* excluding the area at issue from roadless status and wilderness
designation – which is what the 2012 CRR does under the Service's reading
endorsed by the district court here.  In the 2006 EA, the Service addressed some of
the environmental impacts to the resources of the parcel, but never purported to
disclose to the public the unroaded nature of the parcel or thoroughly consider and
analyze the irreversible effects of tree cutting and related activities on future
wilderness designation.  In analogous contexts, courts have held that simply
looking at resource impacts in a NEPA document is not sufficient; the agency must
instead disclose and assess the effects *on roadlessness and future wilderness
designation* as a separate inquiry.  *See Lands Council*, 529 F.3d at 1230-32
(finding NEPA violation concerning failure to assess impacts to roadless
characteristics despite the fact that agency's EIS adequately analyzed effects to
"attributes, such as water resources, soils, wildlife habitat, and recreation

**IV.  THE SERVICE'S OTHER RESPONSE IS ALSO UNPERSUASIVE, AND ONLY REINFORCES THAT THE AGENCY NEVER TOOK A HARD LOOK AT PLAINTIFFS' PETITION AND EVIDENCE.**

Most of the district court briefing focused on the Service's post-litigation response to Plaintiffs' petition, which invoked the CRR as applying to the disputed parcel.  Indeed, the district court's ruling hinges entirely on its analysis of the permissibility of the agency's interpretation of what the district court deemed an ambiguous rule, and the district court made clear that the ruling was not in any way predicated on any alternative basis.  *See* D.E. 28 at 18-20 (J.A.  ) (explaining that the court "need not resolve the adequacy of the [Fitzwilliams] letter").  Therefore, while Plaintiffs only sought reconsideration as to the sole basis for the district court's ruling, Plaintiffs nevertheless summarize why the Service's other response also fails to provide a legally adequate response to Plaintiffs' petition.

First, the Service's August 17, 2012 denial, *see* B00056 (J.A.  ), relies on previous litigation in Colorado that did not involve the question of this parcel's roadlessness, nor could it, considering that the Colorado litigation pre-dated

---

opportunities" in the parcel); *Smith*, 33 F.3d at 1077-79 (finding NEPA violation concerning failure to analyze roadlessness despite agency's EA); *Nat'l Audubon Soc'y*, 46 F.3d at 1448 (finding NEPA violation for failure to analyze roadlessness despite preparation of an EA).

Plaintiffs' petition and thus the administrative record built as a result of that petition was never before the Colorado court or the Tenth Circuit.

Second, as evident from the fact that the Service felt it must submit a post-litigation response from the agency's Chief, the Service's earlier reliance on the Colorado litigation in response to Plaintiffs' petition – which was based on completely new information never addressed in the Colorado litigation – does not meet the rigor of the APA. As a matter of basic logic, the Service's consideration of, and response to, a petition with *new* information in 2012 cannot in any way be considered to "affirm[] a prior denial" that was not based on the same factual information as any purported denial in 2006, and thus cannot be said to constitute the agency simply "affirming a prior denial" under 5 U.S.C. § 555(e). This may well explain why the district court was not comfortable hinging its ruling on the Service's first denial.

In any event, the Service cannot have it both ways. On the one hand, the Service is arguing that the 2012 CRR applies to the disputed parcel and that purported boundary changes on Burnt Mountain were made during the CRR rulemaking process on the basis of "site-specific knowledge of [WRNF] personnel," and that Plaintiffs therefore should have participated in the CRR rulemaking process if they had new information about this parcel. *See* B00057.

58

On the other hand, the Service is arguing that it already resolved, as a final matter, the roadlessness of the disputed parcel in 2006 and in subsequent litigation in Colorado – all of which pre-dated the issuance of the 2012 CRR.  Those two positions are patently irreconcilable, and further demonstrate that the Service has failed to set forth a reasoned and legally permissible response to Plaintiffs' petition that can be squared with the requirements of the APA.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court declare the Service's denial of Plaintiffs' petition arbitrary and capricious, and remand to the Service for further consideration consistent with the APA.[19]

Respectfully submitted

  /s/ William S. Eubanks II_____
William S. Eubanks II
Eric R. Glitzenstein

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206

August 22, 2013                          Attorneys for Plaintiff-Appellants

---

[19]  Alternatively, at minimum, the Court should find that the district court erred in rejecting Plaintiffs' motion for reconsideration on a mistaken factual basis, and remand the *Auer* issue for the district court's reconsideration in the first instance.

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type and volume limitations of Fed. R. App. P.

32(a)(7).  The brief contains 13,929 words.

   <u>  /s/ William S. Eubanks II     </u>
William S. Eubanks II
MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206
beubanks@meyerglitz.com

## <u>CERTIFICATE OF SERVICE</u>

I, William S. Eubanks II, hereby certify that on August 22, 2013, I served

copies of Plaintiffs-Appellants' Opening Brief and Addendum on the following

parties by way of electronic mail (ECF filing):

> Party: Defendant-Appellee United States Forest Service
> Counsel: Nicholas DiMascio
>
> Party: Defendant-Appellee Aspen Skiing Company
> Counsel: Ezekiel Williams

> Respectfully submitted,
>
>   /s/ William S. Eubanks II_____
>
> William S. Eubanks II
> MEYER GLITZENSTEIN & CRYSTAL
> 1601 Connecticut Ave., N.W., Suite 700
> Washington, D.C.  20009
> (202) 588-5206
> beubanks@meyerglitz.com